UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DWIGHT TAMPLIN,

               Petitioner,

v.

WILLIAM MUNIZ, Warden,

               Respondent.

No.  1:12-cv-01633-AWI-SKO  HC

**FINDINGS AND RECOMMENDATIONS THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED**

Petitioner, a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleges five grounds for habeas relief: (1) denial of Sixth Amendment right to self-representation (*Faretta v. California*, 422 U.S. 806 (1975)); (2) ineffective assistance of trial counsel; (3) admission of Petitioner's post-arrest "gang statement" in violation of due process and Fifth Amendment rights; (4) ineffective assistance of appellate counsel; and (5) refusal to bifurcate gang allegations.  The Court referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304.  The undersigned recommends that the Court deny the petition.

I.      **Factual Background**

The California Court of Appeal found the following facts:

> On March 21, 2004, California Highway Patrol (CHP) Officer Michael Szatmari conducted a traffic stop of a Buick Regal in which four African-American males were traveling.  Szatmari called for back-up assistance after he detected what he thought was

1

the odor of burnt marijuana and observed that all the occupants of the Buick were wearing the color blue and at least one occupant bore gang-related tattoos.

The driver and the front passenger, Anthony Robinson and Anthony Taylor, exited the car and were placed in the back of separate patrol cars. [Petitioner] was seated in the right side of the back seat, behind the front passenger seat. Brandon Lambert[1] was seated next to [Petitioner] behind the driver. Before [Petitioner] and Lambert could be removed from the Buick, another police officer called Szatmari's attention to the Buick and told him "that there's a lot of movement in the back seat." Szatmari observed both men "leaning forward with some kind of arm movements towards the floorboard." Less than two seconds later, they straightened up.

After [Petitioner] and Lambert were removed from the Buick, it was searched. A loaded .38-caliber handgun was found under the driver's seat and a loaded .357 revolver was found under the passenger seat. The guns had to be removed from the back seat because they did not fit between the floorboards and the bars that are located across the front of the bottom of the driver and passenger bucket seats. The weapon under the front passenger seat "could definitely be reached by the passenger seated in the back [of the Buick]."[2]

After [Petitioner] was transported to the local CHP office and advised of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), Szatmari told [Petitioner] that he wanted "to know about the guns underneath the seat." [Petitioner] replied, "I ain't no snitch, so I can't say, but if some people don't man up soon, we'll settle this gangster style, because that's how we do things."

[Petitioner] stipulated "that in 1991 the [Petitioner] admitted to Fresno Police that he was a [Villa Posse ("VP")] member and that any [VP] members would have access to guns." Also it was stipulated that VP members "have engaged in a pattern of criminal gang activity."

Jennifer Federico gave expert gang testimony. VP has about 60 validated members and their primary activities include crimes such as homicide, assault with a deadly weapon, robbery and sale of narcotics. The Buick was not stopped by Szatmari in VP territory. However, it is not unusual for VP members to commit crimes outside their turf. She opined that all four men in the Buick were VP members. She concluded that [Petitioner] was a VP member because he admitted membership in 1991, had gang-related tattoos, was arrested in company with three validated VP members and was identified as a VP member "by a reliable source." Also,

---

[1] In an interview with Petitioner's investigator, Robert Holden, Lambert spelled his first name "Brandonn." Doc. 55-2 at 9. In all other instances, Lambert's first name is spelled "Brandon." For consistency, the Court will employ the spelling used in the official records.

[2] Lambert "admitted guilt through [a] no contest plea for possession of the .38 caliber firearm that was found" underneath the driver's seat. Charges against Robinson and Taylor were dismissed following their deaths on April 22, 2004.

[Petitioner]'s statement to Szatmari after his arrest is a "self-admission" of current VP membership.

Federico testified that guns are "very important" to the VP. "It helps them with their intimidation factor, making people respect them. Bigger the gun, the better the gang. It helps them commit their crimes, you know, their assaults with a deadly weapon, the drive-by shootings, their armed robberies, as far as homicide. It helps them do those crimes." After being presented with a hypothetical scenario similar to the facts of this case, Federico opined that possession of the firearms would benefit or promote the gang. She explained her reasoning as follows:

> "My opinion is that [possession of weapons would] benefit the gang or promote the gang because the guns are—again used in helping them commit the criminal activity, their pattern, their sales of narcotics, they protect it. They protect themselves against rival gang members. If they are going to do a robbery, they use that for the robbery. If they are going to do a drive-by shooting, they use weapons such as guns, firearms."

Taylor's former girlfriend, Loretha Session, was called as a defense witness. She testified that on March 21, 2004, she opened the back passenger door of a bluish green, four-door car and placed a gun under the passenger seat. Taylor had given her the gun for safekeeping and she no longer wanted to store it for him because they had severed their relationship that day.

*People v. Tamplin*, 2007 WL 1365988 at *1-*2 (Cal. App. May 10, 2007) (No. F050103).

## II.    Procedural Background

A complaint filed March 23, 2004, charged Petitioner and three codefendants with possession of a firearm by a felon in violation of California Penal Code § 12021(a)(1). The charges were later amended to possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)) for the benefit of, at the direction of, and in association with a street gang (Cal. Penal Code § 186.22(b)(1)). The information alleged that Petitioner had four convictions for serious or violent felony or juvenile adjudications (strikes).

In January 2006, Petitioner was tried before a jury in Fresno County Superior Court. On January 23, 2006, the jury found Petitioner guilty and found the alleged enhancements to be true. On March 24, 2006, the court denied Petitioner's motion for a new trial, and sentenced Petitioner to an indeterminate term of 45 years to life.

3

Petitioner filed a notice of appeal on April 4, 2006.  On May 10, 2007, the Court of Appeals affirmed the judgment of conviction, vacated the sentence, and remanded for resentencing.  On May 25, 2007, Petitioner filed a motion for rehearing in which he urged the Court to consider a meritorious *Faretta* claim that had not been raised in the original appeal.  The Court of Appeal denied the motion for rehearing on May 31, 2007.  On July 19, 2007, the California Supreme Court denied the petition for review.

On April 18, 2008, the Superior Court docketed an amended judgment of conviction resentencing Petitioner to an indeterminate term of 25 years to life.  Petitioner appealed the amended sentence to the Court of Appeal, contending that the Superior Court had abused its discretion in denying his request to dismiss one or more of his prior serious felony convictions (strikes) pursuant to *People v. Superior Court (Romero)*, 13 Cal.4th 497 (1996).  On December 5, 2008, the Court of Appeal affirmed the sentence.

On January 12, 2009, Petitioner filed a petition for review in the California Supreme Court.  The Supreme Court denied review on February 19, 2009.

On May 7, 2008, Petitioner filed a petition for writ of habeas corpus in Fresno County Superior Court.  He contended that "(1) he received ineffective assistance of counsel when his trial counsel failed to prepare and file necessary motions in a timely manner, (2) his trial counsel neglected to call witnesses to testify for the defense, [] (3) his appellate counsel failed to raise a meritorious argument that petitioner's motion to represent himself was improperly denied by the trial court; (4) his fifth amendment and due process rights were violated when the trial court admitted statements made by [P]etitioner in order to prove the gang enhancement, and (5) his sixth amendment right to counsel was violated when trial counsel failed to prepare for trial or consult with petitioner about his defense."  *In re Dwight Tamplin, Jr.*, No. 08CRWR678972 at 1-2 (Cal.Super. Jan. 5, 2009) (Doc. 55-1 at 88-89).  The Superior Court denied the petition on January 5, 2009.

On May 1, 2009, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  The Court of Appeal denied the petition on July 7, 2011.

///

4

On November 8, 2011, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  The Supreme Court denied the petition on August 22, 2012.

On October 4, 2012, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in this Court.  On October 3, 2013, the Court appointed counsel to represent Petitioner.  Thereafter, Petitioner filed the amended petition for writ of habeas corpus that is now before the Court.

**III.   Standard of Review**

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000).  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which applies to all petitions for writ of habeas corpus filed thereafter.  *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997).  Under the statutory terms, the petition in this case is governed by AEDPA's provisions because Petitioner filed it after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).  Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings.  *Id.*  Under AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

///

///

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71.  To do so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law."  *Id.* at 72.  The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.  *Early v. Packer*, 537 U.S. 3, 8 (2002).  The federal court must apply the presumption that state courts know and follow the law.  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).  The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent.  *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lockyer*, 538 U.S. at 75-76.  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable.  *Harrington*, 562 U.S. at 102.

///

6

## IV.    Violation of Right to Self-Representation

Petitioner contends that he was denied his Sixth Amendment right of self-representation as articulated in *Faretta v. California*, 422 U.S. 806 (1975).  Respondent counters that the state court reasonably concluded that Petitioner failed to establish a violation of that right.

### A.    State Court Decision

Having rejected four of Petitioner's five habeas claims as meritless, the Fresno County Superior Court addressed only Petitioner's third contention,[3] that he received ineffective assistance from appellate counsel when counsel failed to raise the argument that Petitioner's rights were violated by the denial of his *Faretta* motion.  The superior court determined that Petitioner did not establish a violation of his right to represent himself.

The court acknowledged that when a motion to proceed *pro se* is timely interposed, a trial court must permit a defendant to represent himself upon ascertaining that he has voluntarily and intelligently elected to do so, irrespective of how unwise such a choice might appear to be.  Unlike the right to representation by counsel, however, the right of self-representation is waived unless the defendant articulately and unmistakably demands to proceed *pro se*.  Under *Faretta*, an insincere request or one made under the cloud of emotion may be denied.  A motion for self-representation made out of a temporary whim, or out of annoyance or frustration, is not unequivocal.

Under California law applying *Faretta*, a defendant must invoke his right to self-representation within a reasonable time before the commencement of trial.  The trial court must then grant or deny the motion based on factors such as the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request,

---

[3] Because the California Supreme Court summarily denied review, the Court must "look through" the summary denial to the last reasoned decision, which is, in this case, the opinion of the Fresno County Superior Court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).  The California Court of Appeal and Supreme Court summarily affirmed the Superior Court's decision.

the length and stage of the proceedings, and the disruption or delay that might reasonably be expected to follow the granting of such a motion.  If the defendant fails to object to the representation prior to trial, he may waive his right to self-representation.

In this case, Petitioner originally moved to represent himself in February of 2005, and the court granted the motion.  In June 2005, Petitioner hired attorney Greg Morris to represent him.  Mr. Morris apparently substituted into the case on June 22, 2005.

On July 8, 2005, Petitioner moved to represent himself because the California State Bar had suspended Morris's license to practice law.  The trial court denied the motion, finding that the motion was equivocal and that timeliness [was] a substantial factor because the trial date was only about six days away.  The trial court then appointed counsel for Petitioner and continued the trial date to give counsel time to prepare.  The case was not tried until January of 2006.

In the habeas action, the court concluded that Petitioner's right to self-representation was not violated:

> Petitioner had at least six months after the denial of the [second] *Faretta* motion in which to object to the appointment of new counsel, but he failed to do so.  He made fourteen separate appearances before seven different judges.  He made appearances in different master calendar and trial courts.  He showed no reluctance to raise issues regarding various alleged allegations of his constitutional rights in his appearances before the law and motion judges.  However, [P]etitioner failed to make any objection to the appointment of counsel after his [second] *Faretta* motion was denied.  Although the trial court originally denied the motion based on the timeliness issue, once the trial had been continued several months, [P]etitioner had ample time to reassert his request for self-representation.  Thus, [P]etitioner waived the right to object to the denial of his Sixth Amendment rights after trial.

Doc. 64-2 at 5.

The court interpreted Petitioner's hiring of Morris as further evidence Petitioner was not unequivocal in his desire to represent himself.  It found that Petitioner's proceeding with attorney

///

8

1    Linden Lindahl as trial counsel indicated his satisfaction with Lindahl's representation at that

2    time. *See* Doc. 64-2 at 2-7.

3        **B.    Discussion**

4        "[U]nder the sixth amendment a criminal defendant has the right to waive his right to

5    counsel and represent himself, provided that he knowingly, intelligently, and voluntarily elects to

6    do so." *United States v. Robinson*, 913 F.2d 712, 714 (9th Cir. 1990).  "The sixth amendment's

7    guarantee of assistance of counsel is unusual among constitutional rights in that it is also

8    implicitly a guarantee of its opposite, the right to refuse counsel." *Adams v. Carroll*, 875 F.2d

9    1441, 1444 (9th Cir. 1989) (citing *Faretta*, 422 U.S. at 819).

10       Although the sixth amendment right to assistance of counsel is automatic, a defendant

11   "must negotiate a number of procedural obstacles" to exercise his right to self-representation.

12   *Adams*, 875 F.2d at 1444.  "Because a defendant normally gives up more than he gains when he

13   elects self-representation," a district court must be "reasonably certain that he in fact wishes to

14   represent himself." *Id.*  There is a presumption against the waiver of constitutional rights, and a

15   waiver is not effective unless an "intentional relinquishment or abandonment of the known right

16   or privilege" is established. *Brookhart v. Janis*, 384 U.S. 1, 4 (1966) (quoting *Johnson v. Zerbst*,

17   304 U.S. 458, 464 (1938)). *See also Brewer v. Williams*, 430 U.S. 387, 404 (1977).

18       In the Ninth Circuit, a district court makes this determination by considering whether the

19   waiver of the right of self-representation was (1) unequivocal, (2)  knowing and intelligent, and

20   (3) voluntary. *Robinson*, 913 F.2d at 714-15.  The court must also determine that the waiver is

21   timely and not made for the purpose of delaying the proceedings. *United States v. Smith*, 780

22   F.2d 810, 811 (9th Cir. 1986).  Whether a defendant waived his right to counsel is a mixed

23   question of law and fact. *Harding v. Lewis*, 834 F.2d 853, 857 (9th Cir. 1987).

24       A waiver is unequivocal if it meets the underlying purposes for requiring an unequivocal

25   waiver: "the defendant was not seeking to waive his right in a thoughtless manner; he persisted

26   despite the trial court's having engaged him in extensive discussion about the dangers of

27   proceeding pro per; and his request did not appear to be a 'momentary caprice or the result of

28   thinking out loud.'" *Robinson*, 913 F.2d at 714 (quoting *Adams*, 875 F.2d at 1445).  For example,

1   a defendant's impulsive request to proceed *pro se* was equivocal when it was emotionally voiced

2   after defendant lost his motion for substitution of counsel.  *Jackson v. Ylst*, 921 F.2d 882, 888 (9th

3   Cir. 1990).

4          Knowing and intelligent waiver of the right to counsel requires a showing that the

5   defendant was "aware of the nature of the charges against him, the possible penalties, and the

6   dangers and disadvantages of self representation."  *United States v. Balough*, 820 F.2d 1485, 1487

7   (9th Cir. 1987).  Because trial judges have the opportunity to observe a defendant's demeanor for

8   an extended period, a trial court's express finding that the defendant's waiver was knowing and

9   intelligent is entitled to deference.  *United States v. Moya-Gomez*, 860 F.2d 706, 739 (7th Cir.

10  1988).

11         Applying this established law to the facts and circumstances recognized by the state court,

12  the undersigned concludes that the state court reasonably determined that Petitioner's waiver was

13  equivocal.  Accordingly, the undersigned recommends that the Court deny habeas relief on the

14  first ground of the petition.

15  **V.**      **Admission of Petitioner's Post-Arrest Statement**

16         Petitioner contends that his due process and Fifth Amendment rights were violated by

17  admission of his post-arrest statement: "I'm not a snitch so I can't say.  But if some people don't

18  man up soon, we'll settle this gangster style because that's how we do things."  Because the

19  statement attributed to Petitioner appears in a paragraph summarizing the statement made to

20  police by co-defendant Robinson, the only co-defendant who waived his *Miranda*[4] rights and

21  gave a statement, Petitioner challenges the accuracy and reliability of its attribution to him.

22         Respondent replies that the state court's factual finding that Petitioner made the statement

23  is presumed correct and that the state court's determination to admit it as evidence is not a

24  constitutional question cognizable on federal habeas review.

25      **A.**      **Factual and Procedural Background**

26         Following the arrest, Robinson acknowledged his *Miranda* rights and agreed to speak with

27  the CHP officers.  Doc. 55-2 at 97.  After acknowledging their *Miranda* rights, Petitioner, and

28  _____

   [4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

co-defendants Taylor and Lambert declined to speak with the officers.  Doc. 55-2 at 99, 101, and 103.  In pertinent part, the police report states:

> I interviewed Robinson at the Fresno CHP Office at 2130 hours.  Robinson waived his Miranda Rights at 2129 hours.  Robinson related that he and Taylor were driving around Fresno when they picked up [Petitioner] and Lambert at Shields and Dakota.  He had met [Petitioner] and Lambert before but they were actually Taylor's friends and not his.  They were going to his girlfriend's house when I stopped him on Olive and Crystal.  Robinson related that he did not have any guns in the car and that he did not have any with him.  He related that the guns were put under the seat after I had him exit the vehicle.  ***I asked [Petitioner] who put the guns there and he said, "I'm not a snitch so I can't say.  But if some people don't man up soon, we'll settle this gangsta style because that's how we do things."***  Robinson concluded by saying, "I knew I shouldn't have picked up those niggas."  Robinson then related that he would not say anything else and that he no longer wanted to answer any questions.

> Doc. 55-2 at 106 (emphasis added).

On January 19, 2006, Officer Szatmari testified in response to the prosecutor's questions that Petitioner made a statement to him regarding the incident, saying, "I ain't no snitch, so I can't tell, but if people don't man up, we'll settle this gangster style."  RT127.  After refreshing his memory by looking at his report, Szatmari testified that he wrote the statement in his report the following day.  Because he was interrupted while preparing the report, he testified, "I was starting with someone else's interview, got up to go handle a call, came back, and just interrupted the interview, so it reads like a mistake, like the wrong person's saying it."  RT129:10-14.  Petitioner's counsel then cross-examined Szatmari on the *Miranda* warnings, eliciting testimony that only Robinson agreed to give a statement.  Szatmari, however, testified that Petitioner gave the "gangster statement" before declining to speak with him.

Lindahl attempted to clarify the nature of Szatmari's error, but Szatmari reiterated that Petitioner made the gangster statement.  Szatmari explained that he erred by not setting Petitioner's statement in a separate paragraph from Robinson's statement, not by mistakenly attributing Robinson's statement to Petitioner.

///

///

11

The trial judge characterized the determination as requiring him to address three issues: (1) whether Officer Szatmari's testimony was credible; (2) whether Petitioner's Miranda rights were violated; and (3) whether the statement was admissible "under 352." He stated:

> On the first question of whether the evidence establishes by preponderance of the evidence that the statement that Officer Szatmari attributes to [Petitioner] was given by [Petitioner] to him, the court finds the testimony to be credible for two reasons. One is that looking at the statement itself, it does not seem to be out of place just the way its written where it says, I asked [Petitioner]. It doesn't seem to me to fit with what precedes that in taking the statement from Mr. Robinson. I also find that the officer's testimony and explanation how that got put in the middle of Mr. Robinson's statement credible.
>
> On the question of Miranda, I believe the officer in his testimony that the Miranda warnings were given and that after they were given, when the defendant was asked whether he would talk, is when the statement was given and it was thereafter that he indicated that he had nothing to say. I do not find a violation of Miranda under the circumstances.
>
> Under 352, the statement is probative on the charges because it goes to possibly the defendant's knowledge and motives. And under 352 I don't think the defendant has established that the— there is a likelihood that the undue prejudice substantially outweighs that probative value. I think the probative value is real and substantial here. Therefore the request to exclude it under 352 is denied.

RT 172:14-RT 173:14.

**B.     Propriety of Admitting Petitioner's Statement**

The trial court made its determination under California Evidence Code § 352. Section 352 provides that as a matter of discretion, a trial court may exclude evidence if its probative value is substantially outweighed by the probability that admission will result in undue consumption of time, undue prejudice, confusion of the issues, or misleading the jury. Issues regarding the admission of evidence are matters of state law, generally outside the purview of a federal habeas court. *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). "The admission of evidence does not provide a basis for habeas relief unless it rendered the trial fundamentally unfair in violation of due process." *Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995). "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6 (1983).

"Although the [U.S. Supreme] Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, see *Williams*, 529 U.S. at 375 . . ., it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley*, 568 F.3d at 1101.  Thus, even if this Court assumes that the trial judge erred and admitted overtly prejudicial evidence, no clearly established Federal law applies.  Petitioner is not entitled to relief under this claim.

## VI.     <u>Ineffective Assistance of Counsel</u>

In his second claim, Petitioner alleges that he was denied effective assistance of counsel when (1) his trial attorney failed to prepare Loretha Session for her testimony; (2) his trial attorney failed to present the exculpatory testimony of (a) Brandon Lambert and (b) Catrina Session; and (3) his appellate attorney failed to raise the violation of his right to self-representation.  Respondent contends that because Petitioner impermissibly relies on evidence that he did not present to the state court, he cannot meet his burdens under *Strickland* and AEDPA.

### A.     <u>Standard of Review</u>

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "[T]he right to counsel is the right to effective assistance of counsel."  *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 688, 694.  The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient and (2) prejudice.  Both elements are mixed questions of law and fact.  *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

The scope of federal habeas review of a claim of ineffective assistance of counsel is narrow. *Dows v. Wood*, 211 F.3d 480, 484 (9th Cir. 2000). A habeas petitioner has the burden of proving that the state court applied the *Strickland* standard in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. 685, 699 (2002).

To prove that an attorney's performance was deficient, a petitioner must establish that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. This requires the petitioner to identify the acts or omissions that he alleges were not the result of reasonable professional judgment. *Id.* at 690. In a federal habeas action, the court must then determine whether considering the facts and circumstances as a whole, the identified acts or omissions were outside the range of competent and professional legal assistance. *Id.* "We strongly presume that counsel's conduct was within the wide range of professional assistance, and that he exercised acceptable professional judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990).

The standard for reviewing counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689. "[E]very effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* The petitioner must overcome the presumption that the challenged behavior constituted "sound trial strategy." *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). "The object of an ineffectiveness claim is not to grade counsel's performance." *Strickland*, 466 U.S. at 697.

**B.   Trial Counsel's Alleged Ineffective Assistance**

      **1.   Failure to Prepare Loretha Session for her Testimony**

In their search of the car following the arrest of Petitioner and his co-defendants, police discovered a loaded silver .357 magnum revolver under the passenger seat in front of Petitioner.

14

1  Anthony Taylor's girlfriend, Loretha Session, testified that she had placed Taylor's gun under the

2  passenger seat without his knowledge after they broke off their relationship earlier on the day on

3  which police discovered the gun in the car. Petitioner contends that trial counsel failed

4  adequately to prepare Ms. Sessions' testimony, resulting in her hesitating to identify the gun,

5  which appeared discolored at trial. Respondent argues that in state court, Petitioner contended

6  only that the defense investigator never interviewed Loretha Session but did not argue that trial

7  counsel failed to prepare her to testify.

8  A defense witness, Session testified that she broke up with Taylor on March 21, 2004,

9  because he had failed to come home the night before. Ostensibly fearing for her daughter's

10  safety, she told Taylor to come to her house to pick up the gun he had stored there. When Taylor

11  refused to take the gun that night, Session put it under the passenger seat while Taylor was

12  otherwise occupied. On cross-examination, Session testified that the gun had been stored in her

13  home for about three months. When Petitioner's trial counsel showed her the gun, however, she

14  was uncertain whether it was the gun that she had put under the passenger seat of Taylor's car.

15  In a sworn affidavit dated August 8, 2006, Ms. Session stated that when Petitioner's

16  investigator, Robert Holden,[5] interviewed her on September 27, 2005, she told him that the gun

17  under the passenger seat belonged to Taylor and that she had put it in the car without anyone's

18  knowledge. According to Ms. Session:

19  
20  
21  
22  
> Before I testified Mr. Lindahl told me he was going to show me two guns while I was on the stand. He only showed me one gun not two like he said he was. The gun that he showed me was the gun I put under the passenger seat but it was discolored with black powder or something on it and Mr. Lindahl said he was going to show me two guns that's why I was hesitant to identify it.

23  Doc. 55-2 at 23.

24  Failure to prepare Ms. Session to testify was not included among the bases for Petitioner's

25  claim of ineffective assistance of counsel in ground two of his state habeas petition. Before the

26  state court, Petitioner contended only that Lindahl did not independently investigate Session or

27  secure a formal statement himself, and did not claim that Lindahl failed to prepare Session's

28  
---
[5] Holden was appointed investigator for Petitioner when Petitioner was representing himself in pretrial proceedings. After attorney Linden Lindahl was appointed to represent Petitioner, he used his own investigator.

1   testimony.  The Fresno County Superior Court found ground two to be one of several grounds

2   without merit.

3           Under 28 U.S.C. §2254(d), a federal habeas court's review is limited to claims that have

4   been "adjudicated on the merits in State court proceedings."  *See Cullen v. Pinholster*, 563 U.S.

5   170, 181-82 (2011).  Under the habeas scheme set forth in AEDPA, state courts have the primary

6   responsibility to address petitioners' claims.  *Visciotti*, 537 U.S. 19, 27.  This means that

7   petitioners must exhaust their claims before the state courts before presenting them for federal

8   habeas review.  28 U.S.C. §2254(b).  Because Petitioner did not advance this argument in the

9   state courts, it is not cognizable.

10          Even if Petitioner had advanced this claim below, he could not logically have prevailed.

11  In his federal petition, Petitioner alleges, "Loretha Session was not prepared for her testimony

12  because trial counsel Lindahl told her he was going to show her two guns while she was on the

13  witness stand.  She was hesitant to identify the one gun because it was discolored."  Doc. 55 at 14

14  (citation to record omitted).  Since Session did not think the .357 magnum revolver looked like

15  Taylor's gun, her reluctance to identify it would not have changed if she had also been shown

16  Lambert's .38 caliber handgun.  Nor would the presentation of the second gun have otherwise

17  bolstered the credibility of Ms. Session's testimony.  The jury could reasonably have found

18  Session's testimony to be unreliable in light of (1) her claim that she immediately removed the

19  gun for her daughter's safety even though it had been in her home for approximately three

20  months, and (2) her failure to share her actions with authorities soon after Petitioner and his co-

21  defendants were arrested for possessing the gun.

22                      **2.       Failure to Call Brandon Lambert as Witness**

23          Petitioner contends that trial counsel's representation was ineffective because he failed to

24  call co-defendant Brandon Lambert to present exculpatory testimony that Petitioner had no

25  knowledge of the weapons in the car.  Respondent counters that Lindahl made a reasonable

26  professional determination that Lambert's testimony would present an unacceptable risk of

27  highlighting the gang aspects of the incident and might have resulted in the prosecution's

28  attempting to tie Petitioner to the murders of Taylor and Robinson.  This claim was part of ground

                                          16

1  two of the state petition, which the Fresno County Superior Court rejected as meritless.

2         On April 22, 2005, Holden interviewed Lambert, who was then an inmate at Wasco State

3  Prison.  According to Lambert, when they were stopped by the police, the four co-defendants

4  were going to the aid of one co-defendant's sister,[6] who had been assaulted at a motel.  Taylor

5  and Robinson picked up Lambert and Petitioner from an apartment.  Lambert and Petitioner did

6  not know each other well.  Although Lambert acknowledged that each of the four co-defendants

7  had previously been gang members, he denied that any was currently active in a gang.  All four

8  had been drinking together earlier in the day, and Lambert was "under the influence."

9         Although he was carrying a "380" handgun,[7] Lambert did not think that Petitioner knew

10  that Lambert was carrying the gun in his pocket.  The .357 belonged to Taylor, who had shown it

11  to Lambert at his home earlier in the day.  Although Lambert did not know that it was under the

12  passenger seat, he was not surprised since Taylor usually carried the gun.  Lambert did not think

13  Petitioner had been carrying the .357 because he wore clothing that would not have concealed the

14  gun.  After an officer[8] stopped the car, ostensibly for swerving out of its lane, the driver could not

15  produce a driver's license and was arrested.  Before police returned to escort the passengers from

16  the car, Lambert dropped his gun to the floor and kicked it under the driver's seat.

17         After trial, in a sworn affidavit dated August 19, 2006, Lambert changed his story:

18         On March 21, 2004 I was the rear driver side passenger in the car
            driven by Anthony Robinson.  [Petitioner] got in the car no more
19         than 10-15 minutes before we were pulled over.  We picked him up
            on Blackstone off Princeton by the store at the phone booth.  He
20         was stranded.  Anthony Robinson asked him if he needed a ride and
            told him he would take him home.  [Petitioner] did not get in the car
21         with a gun, and he did not know I had a gun.  The gun was too big
            for him to carry in what he was wearing.  He was wearing blue
22         sweat pants and a blue Michael Jordan jersey.  Sweat pant packets
            are too small to carry that gun.  I hung out with Anthony Taylor on
23         a regular basis and I seen him with the 357 on a regular basis.  I
            knew who the gun belong to when I saw it.  [Petitioner] never made
24         any furtive movements or did any reaching in the car.  The only one
            of us that waived our rights, gave a statement, and was interviewed
25         at the CHP office was Anthony Robinson.  [Petitioner] was not

26  ────────────────
    [6] Lambert did not identify whose sister was beaten.
27  [7] Following discussion with Holden, Lambert acknowledged that the gun was likely a "338," as reflected in the police
    report.
28  [8] Lambert was uncertain whether the officer was a member of the police department, sheriff's department, or
    California Highway Patrol.  His recollection of the officer's uniform was vague.

> participating in any gang activity March 21, 2004.  He was not an active gang member.  I told Robert Holden I would testify in court.  I was willing to testify to this in court but I was never contacted after my statement was given to Robert Holden and I was not sent a subpoena.

Doc. 55-2 at 21.

To prove the first prong of the *Strickland* test, deficient performance, a petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness," or "outside the wide range of professionally competent assistance."  466 U.S. at 688, 690.  Review is highly deferential and must focus on counsel's perspective at the time at issue.  *Id.* at 689.  The habeas court should initially assume that counsel's actions reflected sound trial strategy.  *Pinholster*, 563 U.S. at 191.  The court's analysis must proceed objectively and must affirmatively consider counsel's reasons for proceeding as he did.  *Id.* at 196.  "There are countless ways to provide effective assistance in any given case."  *Strickland*, 466 U.S. at 689.  The petitioner bears the heavy burden of overcoming the presumption that the challenged action "might be considered sound trial strategy."  *Id.* at 689 (quoting *Michel*, 350 U.S. at 101).

In a letter to the Fifth District Court of Appeal, Lindahl explained his strategy in declining to present Lambert as a witness:

> I did not call Brandon Lambert as a witness in the case, nor did I intend to call Mr. Lambert as a witness.  I advised Petitioner that I would not be calling Mr. Lambert as a witness.
>
> I was informed that Brandon Lambert was a validated member of the Villa Posse, the same organization that the District Attorney was alleging that [t]he Petitioner acted for the benefit of as a street gang.  There were two firearms discovered in the vehicle in which Petitioner was riding on the night of the arrest.  I knew I would be able to elicit testimony from the prosecution witnesses that Mr. Lambert had admitted possession of one of the firearms, and I in fact did elicit that testimony during cross-examination.  The jury was made aware that Mr. Lambert admitted to possession of a .38 caliber pistol.  I did not wish to put Mr. Lambert on because doing so would allow the prosecution to cross-examine in great detail the gang affiliation of Mr. Lambert, and as a result, of Petitioner as well.  This was a case in which I was concerned with minimizing the atmosphere of intimidation and fear which the prosecution was trying to create.  Introducing Mr. Lambert as a witness would, in my professional opinion, have thickened that atmosphere tenfold, to the Petitioner's detriment.  Mister Lambert may have been willing to testify that the Petitioner was not a gang member, but the applicable subsections of Penal Code section 186.22 do not require

18

gang membership, only "***association with***" or "***for the benefit***" of a criminal street gang.

I felt that putting Brandon Lambert on the stand would have been more harmful than helpful to the Petitioner's case, and that is still my view of it.

Doc. 55-2 at 28-29.

Focusing on Lambert's conclusory statements that Petitioner was not an active gang member and did not know that there were guns in the car, Petitioner never directly addresses Lindahl's trial strategy. Considering each of Lambert's statements diminishes the value of Lambert's conclusory statements and exposes details likely to compromise the credibility of both Lambert and Loretha Session.

Lindahl's strategy to minimize exploration of the co-defendants' gang affiliations appropriately acknowledged the sentencing enhancements applicable under § 186.22 if the jury concluded that Petitioner was associating with or sought to benefit a criminal street gang. This would have been a particular concern to the extent that Lambert testified, consistent with his statement to Holden, that all four co-defendants were drinking together earlier in the day and that Taylor and Robinson returned to take Lambert and Petitioner from an apartment where both were located to a motel where someone's sister had been beaten. Despite Lambert's claim that he did not know Petitioner well, the circumstances described in the Holden statement reveal that the four co-defendants had a relationship in which all four would drink together, Petitioner would spend time with Lambert in his apartment, and Taylor and Robinson would respond to the request of Lambert or Petitioner or both for assistance. Further, Lambert's testimony that the four co-defendants had been together earlier in the day strongly suggested that Petitioner, too, had witnessed Taylor's open display of his weapon earlier in the day. Had Lindahl called Lambert only to testify that Petitioner was not an active gang member and did not own the .357 gun, the prosecution surely would have cross-examined him about the statement as a whole, revealing the incriminating portions of the statement.

Lambert's depiction of Taylor's consistent habit of carrying his gun would also have undermined Loretha Session's testimony that the gun had been stored in her home, that Taylor

1   did not want to take the gun with him, and that Session had placed the gun under the seat of his

2   car without his knowledge.

3        As Respondent points out, Lambert's testimony also could have opened the door to

4   testimony regarding the murders of Taylor and Robinson.  Other than Loretha Session's single

5   statement that Taylor had been killed, the murders of Taylor and Robinson following their release

6   on bond in this case were not acknowledged in Petitioner's trial.  Had Lambert's testimony

7   resulted in greater emphasis on the co-defendants' murders, the "atmosphere of intimidation and

8   fear" that worried Lindahl would have been greatly magnified, likely to Petitioner's prejudice.  In

9   addition, disclosure of Taylor's and Robinson's murders would have greatly increased the

10  prejudicial effect of Petitioner's statement about settling matters "gangsta style."

11       Finally, an assessment of Lambert's potential lack of credibility cannot disregard that his

12  story changed in his post-trial affidavit.  In that account, Lambert claimed that he, Robinson, and

13  Taylor gave simply give Petitioner a ride home after seeing him at a bus stop.  If Lambert had

14  presented his revised account at trial, the prosecution could have used the Holden statement to

15  impeach Lambert's testimony with potentially devastating effect.

16            **3.        Failure to Call Catrina Session as Witness**

17       In a post-trial certification dated March 17, 2007, Catrina Session wrote:

18       In 2005, my sister Loretha Session asked me if I remembered when
         she and Anthony got into it, she put that gun in that car, and I told
19       her yeah how could I forget.  She told me that she told the attorney
         that I knew what happened that day and the attorney would be
20       contacting me.  He never contacted me.  Loretha told me when she
         spoke with the attorney again he told her that her testimony was
21       sufficient and he did not need my testimony.  However, it was not
         and that is why I am coming forth now.
22
         On March 21, 2004, I was at my sister's house visiting her and my
23       niece.  While I was there, she received a phone call from her
         boyfriend and I heard my sister on the phone arguing telling him he
24       needed to come get his clothes and gun from out her house.  When
         Loretha hung up the phone, she was mad and said she was tired of
25       Anthony and she was through with him.  A little while later
         Anthony showed up and they started arguing again about him
26       cheating on her and the gun.  He told her to stop trippin' he was not
         taking anything and he went to the bathroom.  Loretha came from
27       the back with the gun and a towel I thought she was going to shoot
         him and I was scared.  She told me to watch out for Anthony while
28       she put the gun in the car he was in.  I stood by the patio door

                                        20

1

2

3

4

5

6

7

> where I could see her at the car and could see when he came from the bathroom. I saw her open the back passenger door, and lean into the car. As she was coming in the door, he was coming out the bathroom. He was trying to continue the argument and she told him to get out she did not want to hear it. His friend was calling him from down stairs and he told her he would be back and he left.
>
> I only know of [Petitioner] due to this incident because he is in jail for Anthony's gun that my sister put in that car. Had I been called as a witness I would have testified under oath to the above statement.

Doc. 55-2 at 26.

8

Lindahl stated that he did not use Catrina Session's statement, which he "viewed as both

9

cumulative and contradictory" to Loretha Session's testimony. Doc. 55-2 at 29. The Fresno

10

County Supreme Court rejected as meritless Petitioner's claim that Lindahl should have called

11

Catrina Session as a witness.

12

As with Lambert, Petitioner fails to overcome the presumption favoring Lindahl's trial

13

strategy. And, as with Lambert, Petitioner fails to address the obvious question raised by Catrina

14

Session's the statement as a whole: If Taylor's friend was waiting downstairs and calling him just

15

as Loretha returned from putting the gun in the car, how was Loretha able to place the gun in the

16

car without the friend's knowledge?

17

### 4.   Conclusion

18

Petitioner failed to carry his burden of proving that Lindahl's representation fell below an

19

objective standard of reasonableness. The Superior Court reasonably rejected Petitioner's claim

20

of ineffective assistance of trial counsel.

21

### C.   Ineffective Assistance of Appellate Counsel

22

Petitioner contends that appellate counsel provided ineffective assistance in that he did not

23

raise the *Faretta* claim or the erroneous admission of Petitioner's purported post-arrest statement

24

in Petitioner's direct appeal. Respondent counters that (1) in view of the unlikelihood that the

25

*Faretta* claim could prevail, appellate counsel was not ineffective in declining to pursue it, and

26

(2) Petitioner's *Miranda* claim was not exhausted.

27

Claims of ineffective assistance of appellate counsel are also evaluated using the

28

*Strickland* analysis. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). Since Petitioner cannot prevail

on any of the first five grounds alleged in the petition, appellate counsel's failure to raise these grounds cannot be said to have prejudiced Petitioner.  The state courts reasonably denied Petitioner's claim of ineffective assistance of counsel.

**VII.   Due Process: Failure to Bifurcate Gang Allegation**

In his petition, Petitioner contended that the trial court erred in failing to bifurcate the gang enhancement from the trial of the gun possession charge.  He argued that because possession of weapons is tied to gang membership,  evidence of his gang affiliation resulted in his being convicted of the gun charge based on character an propensity evidence in violation of his Fourteenth Amendment right to due process.  Respondent replied that in the absence of a federal constitutional right to a bifurcated trial, AEDPA bars relitigation of this claim.  In his reply (traverse), Petitioner agreed that no U.S. Supreme Court authority supported this claim and conceded that the federal court could not address this claim.  Accordingly, the Court should not address this moot claim.

**VIII.   Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b)   There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)   (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

///
///

(A)   the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B)   the final order in a proceeding under section 2255.

(2)   A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)   The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In this case, reasonable jurists would not find the Court's determination that Petitioner has not established grounds for federal habeas relief to be debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court should decline to issue a certificate of appealability.

## IX.     Conclusion and Recommendation

The undersigned recommends that the Court deny the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty**

23

**(30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 17, 2016**                                **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE

24